## Hatfield Township v. Lansdale Municipal Authority

282

*William R. Cooper*, for plaintiffs.

*Aaron S. Swartz, 3rd*, for defendants.

GERBER, J., April 6, 1959.—This action in equity was commenced by plaintiffs, Township of Hatfield and four individuals, against defendants, Lansdale Municipal Authority, hereafter referred to as the authority, William Stothoff Co., Inc., Wiley Reading, Charles R. Ridington and Thomas T. Ridington. By leave of court, during the course of the litigation, nine additional individuals were named as party plaintiffs and the caption changed to plead a class action. Charles R. Ridington died subsequent to the filing of

the complaint and his executrix was substituted as a party defendant.

The cause arose as a result of the authority commencing the drilling of a water well in Hatfield Township. The authority had contracted with William Stothoff Co., Inc., to do the drilling and Wiley Reading was the supervisor on the job site for the drilling company. The land on which the well was drilled originally belonged to Thomas and Charles Ridington, the authority having initiated eminent domain proceedings to obtain the land necessary for the well site.

Plaintiffs have prayed for an injunction against defendants, enjoining the operation of the well on four grounds. Plaintiffs claim that an option granted to the authority by the Ridingtons is void because Charles R. Ridington was, at the time, a supervisor of the authority and that such voidness extends to the eminent domain proceedings. Secondly, plaintiffs allege that the authority must obtain a special exception under the Hatfield Township Zoning Ordinance before they can use the land for the proposed well operation. Thirdly, plaintiffs allege that approval by the Pennsylvania Public Utilities Commission is required, and fourthly, it is averred that the operation of the water well by the authority is unlawful because it damages and impairs the private water supplies of plaintiffs. Defendants denied plaintiffs' averments.

After two days of testimony by all parties, the hearing was recessed and by agreement of the parties, the authority completed the drilling of the well and conducted a two day pumping test so that the court could be presented with testimony as to the effect the authority well would have on the wells of plaintiffs and the class they represent. Two additional days of hearings were then held. Proposed findings of facts and briefs were submitted to the chancellor. This opin-

ion and order constitutes a complete determination on the merits of the action. . . .

## Findings of Fact

6. On or before November 1, 1957, Charles R. and Thomas J. Ridington were the owners of a tract of land on the northwest side of Oak Park Road, Hatfield Township, containing 16.58 acres.

7. On November 1, 1957, Charles R. and Thomas J. Ridington entered into an agreement with the Lansdale Municipal Authority giving the authority an option to drill a well on a two-acre portion of said tract and take title to the same at a price of $1,200 per acre if sufficient water was obtained.

8. By a resolution adopted January 9, 1958, the Lansdale Municipal Authority, under its power of eminent domain, condemned the two-acre portion of said tract plus a 20-foot right of way, damages to be set by a jury of view.

9. On November 22, 1957, the William Stothoff Co., Inc., under contract and direction of the Lansdale Municipal Authority, commenced the drilling of a well on the site in question.

10. No permit had been obtained from the Township of Hatfield. After notice served by the zoning officer of Hatfield Township, an application for a permit was refused on the basis that the drilling of the well was not in compliance with the Hatfield Township Zoning Ordinance. An appeal to the Hatfield Township Zoning Board of Adjustment resulted in the refusal of the granting of a permit to the Lansdale Municipal Authority on the basis that a special exception was needed to drill the well. The appeal of the Lansdale Municipal Authority from that decision is now pending before this court, no application for a special exception having been filed.

11. Article six, sec. 601, of the Hatfield Zoning Ordinance provides that land in the R-100 Residential

District may be used for any of the following purposes and no other: (1) Single-family dwelling; (2) Municipal buildings and municipal uses; (3) Any of the following purposes when authorized as a special exception by the board of adjustment; (a) Educational, religious and philanthropic use, excluding correctional or penal institutions; (b) Hospital, sanitorium, convalescent home; (c) Golf course and golf house, excluding driving range and miniature golf course; (d) public utility facility.

12. The site of the well herein involved is located in the R-100 Residential District of Hatfield Township . . .

## Discussion

I. The effect of the Hatfield Township Zoning Ordinance on the installation and operation of the authority well has been raised in this equity proceeding as well as being a separate action in itself: In re Appeal of Lansdale Municipal Authority from Decision of Zoning Board of Hatfield Township, no. 4, February term, 1958. Since both actions involve the same property and contemplated use therof, this court has considered them together. Although the zoning issue is discussed in a separate opinion (the appeal of the authority from the decision of the Hatfield Township Zoning Board), the court feels that it is necessary to again discuss that issue in this opinion so as to decide all the issues and questions that have been raised before it.

The property in question is located in an R-100 Residential District and section 601 of the Hatfield Township Zoning Ordinance permits a municipal use in that district. The authority contends that it is a municipal use and therefore can install and operate its well without the permission or authorization of the Hatfield Township Zoning Board. On the other hand, the township contends that municipal use, as used in their

ordinance, refers only to a Hatfield Township munici-
pal use and does not include a proprietary function
such as a water supply system. The township further
contends that the authority is a "public utility facility"
under section 601(3) (d) and must obtain a special
exception from the zoning board before they can install
and operate the well.

The Lansdale Municipal Authority is a creation of
the Borough of Lansdale, organized to perform the
municipal function of providing a water supply sys-
tem. An authority, such as the one herein involved, was
born of the necessity to provide needed municipal op-
erations in such manner as to avoid the constitutional
debt limitation placed on the municipality itself. The
municipality and the authority can be equated as being
one and the same in substance, if not in form. The
chancellor is of the opinion that the authority, in pump-
ing and using the water in a water supply system serv-
ing Lansdale as well as other areas, is a municipal use.
The authority is performing an essential municipal
service.

The Hatfield Township Zoning Ordinance does not
define or restrict the meaning of "municipal use." In
the absence of any guides, the court feels compelled to
interpret "municipal use" in a general sense, including
within it any municipal use. On this basis, the Lansdale
Municipal Authority, being a municipal use, comes
within the terms of the zoning ordinance and is entitled
to use the land in question for the proposed use as a
matter of right.

The court is also of the opinion that the term "mu-
nicipal use" does not import a governmental-proprie-
tary function distinction. A municipal use compre-
hends the full range of municipal activities, be they of
a governmental or proprietary nature. Although water
wells and water systems are classified as being a pro-
prietary function (Shirk v. Lancaster City, 313 Pa.

158, 165 (1933) ), this is not controlling in our determination of what a municipal use includes.

The term "municipal use" was interpreted to comprehend a sewage disposal plant, a proprietary function, in Lees v. Sampson Land Company, 372 Pa. 126 (1952). The applicable ordinance therein permitted a municipal use in a residential zone. The court did not see fit to raise any governmental-proprietary distinctions, impliedly holding that "municipal use" included both.

In Jordan v. Township of Lower Merion, 34 D. & C. 551 (1938), the court considered and discarded a governmental-proprietary distinction in interpreting the meaning of a "township use."

It is recognized that both of these cases involved proposed uses by the same municipality that had passed the ordinance, whereas in the case at bar, we are considering a use proposed by the Lansdale Municipal Authority, an organization separate and apart from the Township of Hatfield, whose zoning ordinance is herein involved. However, the chancellor is of the opinion that this distinction is not controlling. "Municipal use" is broad enough to encompass municipal uses by the municipality passing the ordinance and other municipalities. Since a governmental-proprietary distinction does not apply to one, it should not apply to the other.

A governmental-proprietary function distinction is important in the question of whether a governmental unit is bound by the terms of a zoning ordinance: Harward v. Haas, 59 D. & C. 658 (1947). However, the case at bar does not involve that question. We are here concerned with the problem of whether the authority qualifies as a "municipal use" within the terms of the ordinance.

Therefore, the court is of the opinion that the proposed use of the authority is a municipal use within the terms of the Hatfield Township Zoning Ordinance.

II. Plaintiffs contend that the authority has acted unlawfully in the drilling of this well and in the removal of the water from the ground without the approval of the Pennsylvania Public Utilities Commission. The chancellor feels that there is no merit in this contention. The Pennsylvania Public Utilities Commission has no jurisdiction over the matters herein involved. The Municipality Authorities Act of May 2, 1945, P. L. 382, sec. 4, as last amended by the Act of October 7, 1955, P. L. 671, sec. 1, 53 PS §306B($h$), grants to a municipal authority the right and power to provide reasonable service, including extensions thereof. The court of common pleas is granted exclusive jurisdiction to determine all questions involving the services performed by a municipal authority. Any question involving or raising the adequacy or reasonableness of the authority's services, including any extensions thereof, must be brought in the court of common pleas. The Pennsylvania Public Utilities Commission has recognized that it no longer has jurisdiction over the service and facilities of a municipal authority, such jurisdiction being exclusively in the court of common pleas. In High House Civic Association v. Southwestern Pennsylvania Water Authority, 33 Pa. P. U. C. 748 (1956), a petition to compel water service was filed with the Public Utilities Commission. The commission stated that "we are of the opinion and find that this proceeding is no longer subject to the jurisdiction of the Commission. . .": Page 749. The authority is not required to obtain the permission of the Pennsylvania Public Utilities Commission to drill and operate this well. The court of common pleas has exclusive jurisdiction to determine any question arising from this operation. The matter is properly before this court.

III. Plaintiffs further contend that the option agreement between one of defendants, Charles R. Ridington,

a supervisor of the Lansdale Municipal Authority, and the Lansdale Municipal Authority, whereby the authority acquired an option in the land of Mr. Ridington and his brother for a well site, violates the Municipality Authorities Act and hence is null and void. They further contend that the option agreement makes the entire action in condemning by eminent domain the Ridington land and developing it as a well site null and void. The chancellor does not agree with this contention. Although the option granted to the Lansdale Municipal Authority by Charles R. Ridington and his brother for the purchase of the well site in question may have been in violation of section 10 of the Municipality Authorities Act of 1945, 53 PS §312D, which prohibits a member, officer or employe of an authority to be a party of any contract or agreement with the authority, and makes any such contract null and void, this possible defect was remedied by the condemnation proceedings in eminent domain instituted by the Lansdale Municipal Authority to obtain the property in question. The chancellor does not feel that the option vitiates the entire proceedings in eminent domain.

Section 11.1 of the Municipality Authorities Act of 1945, 53 PS §314, gives the authority "the power to acquire, by purchase or eminent domain proceedings, either the fee, or such right, title, interest or easement in such lands, . . . as the Authority may deem necessary for any of the purposes mentioned in this act." The same section provides:

"The right of eminent domain herein conferred by this section may be exercised either within or without the municipality. . ."

Therefore the authority has the power and authority to obtain land by eminent domain proceedings outside the geographic limitations of the Borough of Lansdale, the municipality creating the authority: Falls Town-

ship Authority v. Levitt & Sons, Inc., 84 D. & C. 223 (1952). In that case, the court stated, at page 235:

"This provision [Section 11 of the Municipality Authorities Act] expressly affirmed that authorities in general, without qualification, might exercise the right of eminent domain either within or without the municipality . . . organizing them."

The Lansdale Municipal Authority possesses the necessary power and authorization to obtain the land site in question by eminent domain proceedings.

Plaintiff's contention that the option granted by the Ridingtons to the Lansdale Municipal Authority vitiates the entire eminent domain proceedings to obtain a well site on the basis of fraud is without merit. There has been no testimony or evidence whatsoever to support any finding or inference of fraud in this option agreement. In the absence of any fraud, the court can see no basis on which to invalidate the eminent domain proceedings. Section 10 of the Municipality Authorities Act of 1945 makes null and void any agreement between a member, officer or employe of the authority and the authority as a matter of public policy, even though fraud may not be involved. Since the court finds that there is no fraud involved here, the court will not extend the illegality to the eminent domain proceedings.

IV. The law of Pennsylvania as respects the rights of landowners in subterranean waters, filtrating and percolating through the ground in undefined streams, was carefully examined and set out in Rothrauff v. Sinking Spring Water Company, 339 Pa. 129 (1940). The general rule is that when a spring or well is dependent on filtrations and percolations through the land of an adjoining landowner for its supply, and in the use of the water in the adjoining land for lawful purposes, the spring or well of the other is destroyed, the adjoining owner, in the absence of malice or negli-

gence, is not liable for the damages thus occasioned: Rothrauff v. Sinking Spring Water Company, supra, at pages 132, 133. This doctrine has been termed "the rule of reasonable user," and the key inquiry in its application is the scope of the limitation embodied in the phrase "in the use of the water for lawful purposes." The court in the Rothrauff case, after discussing and discarding the English rule of absolute appropriation, stated that the "use must be limited to purposes incident to the beneficial enjoyment of the land from which they are obtained, and if their diversion or sale to others away from the land *impairs the supply* of a spring or well on the property of another, such use is not for a 'lawful purpose' . . .": page 134. (Italics supplied).

The Rothrauff decision adopted as the law of Pennsylvania the rule that

". . . a property owner may not concentrate such waters and convey them off his land if the springs or wells of another landowner are thereby damaged or impaired": page 134.

The court held defendant, a privately owned water company, liable to plaintiff. In the case at bar, the authority is not privately owned, but is a publicly owned corporation created by the Borough of Lansdale pursuant to an Act of Assembly. The authority can even be equated with the borough itself, since it was created to provide a municipal service and is a device for municipal operation to avoid the constitutional debt limitation placed on municipalities. Nevertheless, this distinction does not alter the application of the rule. Although there are no Pennsylvania decisions on this very point, other States following the rule of reasonable user have passed upon this question. In Koch v. Wick, 87 So. 2d 47 (Fla. 1956), in a suit to enjoin the operation of a well, the court stated, at page 48, the county is "not in

a favorable position simply because the water drawn is to be furnished the public."

Canada v. City of Shawnee, 179 Okl. 53, 55, 56, 64 P. 2d 694 (1937), after discussing several cases, stated: "It is worthy of note that many of the above cases involved municipalities. . . . However, . . . the fact that defendant is a municipal corporation creates no distinction in its favor.".

Braidburn Realty Corporation v. City of East Orange, 107 N. J. 291, 153 Atl. 714 (1931) ; Forbell v. City of New York, 164 N. Y. 522, 58 N. E. 644 (1900), and Dinger v. City of New York, 42 Misc. 319, 86 N. Y. S. 577 (1903), all involved municipal water companies where the rule was applied to them with equal force. The reasoning that places a public and private water company in the same category was stated in Schenk v. City of Ann Arbor, 196 Mich. 75, 91, 163 N. W. 109 (1917) :

"There is no apparent reason for saying that, because defendant is a municipal corporation, seeking water for the inhabitants of the city, it may therefore do what a private owner of land may not do. The city is a private owner of this land, and the furnishing of water to its inhabitants is its private business."

This court is of the opinion that the view of the cited cases is a proper application of the rule and should be applied in this case. The authority, even though it is a municipal creature, cannot place itself outside the scope of the rule of reasonable user.

Applying the law to the facts, the chancellor finds that the use to be made by the authority of the water obtained from its well is not a lawful use within the meaning of the rule as set out above. The authority plans to use the well in question to withdraw the ground water and distribute it to its customers in the Lansdale and Hatfield area. The water is to be removed from the land from which it is obtained and distrib-

uted, by means of a pumping station and pipelines, to consumers in the area. This is not a use incident to the beneficial enjoyment of the land from which the water is obtained: Rothrauff v. Sinking Spring Water Company, 339 Pa. 129 (1940).

The two-day continuous pumping test was the equivalent of a 90-day pumpage at the expected use without recharge. The results of the test period displayed that the pumping of the authority well adversely affected the wells of. neighboring property owners. Because of the depth of the authority well, it draws water from the confined, as well as the unconfined, water areas found in the Brunswick Shale rock formation. In the competition for the available water, the authority well will draw off a quantity of water such that other wells will go dry or suffer a decrease in water level.

As a result of the pumping test, three wells, all within 700 feet of the authority well, became dry. The water level in other wells dropped and in some cases, the available water was clouded and dirty. Based on figures obtained during the test period by neighboring property owners, the authority well, operating 10 hours a day at 80 gallons per minute, will cause a drawdown in wells within 1,000 feet of the authority well of 2½ feet in 30 days, 4 feet in 60 days and 5 feet in 90 days, assuming no recharge. As the distance between the private wells and the authority well increases, the drawdown in the private wells will decrease. Although a normal recharge could reduce the anticipated drawdown by 50 percent, a noticeable drawdown will still result. Since the wells of the neighboring property owners are generally of the shallow type, most being considerably under 100 feet in depth, operation of the authority well has and will adversely affect them, either causing them to run dry or impairing the supply of water available. The impairment of the water supply has been and will be of two types: The water in the

neighboring wells becomes clouded and dirty and the water level declines.

The anticipated use of the authority well, by diverting the water away from the land from which it is obtained, has and will impair the water supply of the individual plaintiffs and thus constitutes an unlawful use within the meaning of the law as propounded in Rothauff v. Sinking Spring Water Company, 339 Pa. 129 (1940). Therefore, operation of the authority well is an actionable wrong as to those persons whose supply has been impaired.

V. Plaintiffs have requested a permanent injunction restraining the Lansdale Municipal Authority from operating the well. The loss or impairment of their water supply is an irreparable injury, affecting the enjoyment of their land, for which a legal remedy of damages is inadequate. A money judgment would not provide plaintiffs with water, a basic necessity of life. Ross Common Water Company v. Blue Mountain Consolidated Water Company, 228 Pa. 235 (1910), granted a preliminary injunction in a case involving water rights and is authority for the granting of an injunction in this action.

Hatfield Township is one of plaintiffs requesting injunctive relief. The chancellor is of the opinion that Hatfield Township is not a proper party before the court to obtain such relief. The basis of an injunction is irreparable harm and injury to a plaintiff: The Haig Corporation v. Thomas S. Gassner Co., Inc., 163 Pa. Superior Ct. 611 (1949). A property right of the plaintiff must be involved: Ashinsky v. Levenson, 256 Pa. 14 (1917). No property right of Hatfield Township is herein involved. The township does not own the underground water nor does it own or operate any wells that would be adversely affected by operation of the authority well. The township has no property whose enjoyment thereof is being impaired.

The First Class Township Code of June 24, 1931, P. L. 1206, sec. 3108, as amended, 53 PS §58108, authorizes a township to institute an action to restrain a violation of its zoning ordinance. However, since this court is of the opinion that there has been no violation of the Hatfield Township Zoning Ordinance, the above authorization is inapplicable to this case.

Although the Commonwealth possesses the power to control and conserve the use of its water resources, there must be an express authorization of this power to a municipality or a municipal unit before. it has the power to so act. Article XXVII of the First Class Township Code, entitled "Water Supply and Waterworks," 53 PS §57701 et seq., deals with the acquisition, construction and maintenance of water supply facilities, and does not authorize a first class township, such as Hatfield Township, to be a party plaintiff in an injunction action such as this.

Section 1502 of the First Class Township Code, 53 PS §56544, does not authorize Hatfield Township to bring this action for injunctive relief. That section only empowers the township to make regulations for the health, safety, morals, general welfare, cleanliness, beauty, convenience and comfort of the township and the inhabitants thereof.

The chancellor has been unable to find any statutory authority which would authorize Hatfield Township to be a party plaintiff to this action. Therefore, Hatfield Township is not a proper party plaintiff before this court and the suit must be dismissed as to Hatfield Township.

The individually named plaintiffs are proper party plaintiffs to this action in that a property right belonging to them, to wit, their water supply, has been threatened with irreparable injury.

VI. Although the proposed use by the authority of its well and the water drawn therefrom constitutes

an unlawful use under the law of Pennsylvania, the chancellor is cognizant of the municipal function and service performed by the authority and the water supply problem of the areas it services. Plaintiffs are entitled to the protection afforded to them by the law, but at the same time the function performed by the authority should not be overlooked. The authority provides 37,000,000 gallons of water annually to its 73 customers in Hatfield Township and a total of 491,000,000 gallons of water annually to its 4,000 customers in all the areas it serves. The chancellor is desirous of achieving a fair balance between these two interests. See 4 Restatement of the Law of Torts, §§858-864.

It has been stated that a court of equity should not seek to balance conveniences when the preservation of an established right is involved: Sullivan v. Jones and Laughlin Steel Company, 208 Pa. 540, 555 (1904); Weiss v. Greenberg, 101 Pa. Superior Ct. 24 (1930). These decisions involved disputes between private litigants whereas, in the case at bar, the dispute is between private persons on one side and a municipally owned corporation providing a public service on the other hand. In this instance, the chancellor will consider all the circumstances of the dispute and its implications, so as to attempt to achieve a decision that will protect the rights of the private persons and also recognize the need of the authority for a water supply and permit the authority, subject to proper conditions, to operate the well in question.

The function of the authority in providing and maintaining a water supply system possesses important social value and, in view of the water supply problem in the Lansdale-Hatfield area and the increasing competition for the available supply, an efficiently operated water system that can provide for the immediate needs of the area and plan for future needs

warrants the attention of the court in its endeavors to solve the problems confronting it. The authority is dependent upon wells for its water supply and competition for the available supply by many persons tends to become wasteful and expensive. The chancellor will protect the rights of plaintiffs but also would like to achieve a result whereby the authority is not foreclosed from available sources of water.

Therefore, a practical as well as a just solution is necessary in this dispute. Since the authority does provide a needed and useful service, the chancellor is hesitant to enjoin the operation of its Hatfield well. This does not detract from the primary concern of this court, which is to protect the rights of those plaintiffs whose water supply will be impaired by the operation of the authority well. By virtue of the broad powers of a court of equity, the chancellor will allow the authority well to operate if, but only if, certain conditions are met. Since operation of the well will impair the water supply of private wells within a 2,000-foot radius of the authority well, all persons now owning or occupying homes within that radius and all persons who, in the future, own or occupy homes within that radius may demand that the authority install water mains, laterals, water meters and all necessary connections, all at the expense of the authority and without charge to the individuals, to enable such persons to join into the authority system. Persons so joining into the authority system shall pay only for the water they consume at the regular rates of the authority. The authority must comply with this condition within a reasonable time after demand as a condition of being allowed to operate the Hatfield well.

In this manner, it is expected that plaintiffs will have a water supply system available to them without installation charge and at the regular rates for water

used. The problems of pollution of shallow private wells and competition for the available water will thereby be substantially diminished. The authority is being permitted to operate its Hatfield well but only upon compliance with the aforementioned conditions. The chancellor believes that this will protect the right of plaintiffs to have an adequate water supply and, at the same time, allows the authority to perform its important and necessary municipal function.

### Conclusions of Law

1. Equity has jurisdiction.

2. The proposed use of the Lansdale Municipal Authority is a municipal use within the meaning of the Hatfield Township Zoning Ordinance.

3. The Pennsylvania Public Utilities Commission does not have jurisdiction of this matter.

4. The eminent domain proceedings by which the Lansdale Municipal Authority will obtain a portion of the Ridington tract is not null or void.

5. The Township of Hatfield is not a proper party plaintiff to the injunction action.

6. The proposed use of the underground water by the Lansdale Municipal Authority constitutes an unlawful use of the waters because it impairs the water supply of neighboring property owners and the water pumped by the authority is not to be used in connection with the land from which it is drawn.

7. The Lansdale Municipal Authority will be allowed to operate the well if it complies with certain specified conditions.

### Order *

And now, to wit, April 6, 1959, in view of the foregoing, it is ordered, adjudged and decreed that the Lansdale Municipal Authority be permitted to operate

---

* "As amended December 16, 1959. An appeal was taken to the Supreme Court March 16, 1960."

the well located in Hatfield Township on a portion of the Ridington tract, provided however, that on the request of any user or owner of a well within a radius of 1600 feet thereof, which well is in existence at the time the authority commences the operation of its aforesaid well, the authority shall install water mains, laterals, water meters and all other installations and connections without cost to the prospective customers and at the expense of the Lansdale Municipal Authority, the prospective customers only to pay the regular established rate of the authority for water consumed by them. Should the authority refuse or fail to comply with this condition, then in that event, an injunction shall issue, enjoining the Lansdale Municipal Authority from pumping water if said waters are to be used, distributed or transported off the land from which the water is obtained.